**PIPE LINE WORKERS LOCAL NO. 38**
et al., Appellants,

v.

**H. B. ZACHRY COMPANY, Appellee.**

No. 5024.

Court of Civil Appeals of Texas.

Beaumont.

March 10, 1955.

Rehearing Denied March 30, 1955.

Mullinax & Wells, Dallas, Wilder & Berlin, Beaumont, for appellants.

Looney, Clark & Moorhead, Austin, Chester Johnson, San Antonio, A. L. Bevil, Kountze, for appellee.

WALKER, Justice.

The plaintiff, H. B. Zachry Company, sued for an injunction restraining the defendants, five labor unions and an association of labor unions, from committing various acts against plaintiff, its property and employees, and sued also for damages because of acts committed.

The plaintiff is engaged in business in the construction industry, and a part of this business is to make and lay pipe lines. Plaintiff's annual income is very large and so must its business be. Most of plaintiff's work, according to Mr. Zachry, was done in Texas, but not all of it was. In the latter part of February, 1954, the plaintiff got a contract from the Magnolia Pipe Line Company to construct for the latter a pipe line in Texas, between points in Jefferson County and Navarro County. Conferences followed between representatives of some of the defendants and H. B. Zachry, who is the chairman of the board of directors of the plaintiff corporation, at which some of these representatives asked that plaintiff enter into contracts, not with their own unions but with other bodies, two of which may be described as International Unions and the other as a United Association. Mr. Zachry declined, on behalf of the plaintiff, to make any contract. Soon after, plaintiff began work in Jefferson County on the pipe line and after a few days, the premises on which plaintiff had established an office and warehouse were picketed by at least some of the defendant unions. The suit was filed on April 1, 1954, and a restraining order was granted plaintiff on that day, prohibiting picketing and other conduct by defendants. Plaintiff amended the petition and a temporary injunction against defendants was granted plaintiff under this pleading, in terms as prayed for.

The original petition need not be described. The cause was tried on the amended petition and it is alleged in this pleading that the defendants had conspired and were attempting to compel plaintiff to agree to hire only union workmen, that is, to operate plaintiff's business generally under a "closed shop" agreement with said defendants, and that defendants, to accomplish this object, were engaged in picketing the premises we have mentioned. This office was first at Amelia, in Jefferson County near Beaumont, and later at a place near Kountze, in Hardin County; and plaintiff alleged that the picketing done at both places was in mass and had been accompanied by violence and had been unlawful in other respects, and further, that members of the defendant unions had committed acts of violence upon plaintiff's employees at places other than the picket line. The prayer was, in substance, that all picketing be prohibited and that the conspiracy be forbidden and the defendants be restrained from attempting to compel the plaintiff to enter into a "closed shop" agreement with them and from committing violence upon plaintiff's property and employees. Defendants made answer that a bona fide labor dispute existed between them and the plaintiff, and that the picketing of plaintiff's premises was lawful and peaceable.

On April 27th, 1954, trial of the merits began, the court sitting with a jury, and on May 11, 1954, the trial court rendered a judgment on the jury's verdict which, in effect, made permanent the temporary injunction against defendants previously granted the plaintiff. The jury assessed no

money damages to plaintiff and so none were awarded by the judgment. The terms of the injunction are quoted in the margin. From this judgment the defendants have appealed.

## Opinion

The pipe line has been completed since the judgment was rendered. Counsel for the parties so stated when the cause was argued in this court. Accordingly, questions raised on this appeal which pertain only to the construction of the pipe line are moot and the circumstances suggest no reason why these questions should be decided. However, the appeal involves questions which are not moot.

It is assigned as error under Point 1 that the trial court did not have jurisdiction of the cause by reason of that part of Art. 4656, R.S.1925, reading: "writs of injunction for other causes, if the party against whom it is granted be an inhabitant of the State, shall be returnable to and tried in the district or county court of the county in which such party has his domicile, * * *." Point 1 is overruled. This provision regulates venue, not jurisdiction, and no plea of privilege has been filed, nor other plea containing the information or in the form required by Texas Rules of Civil Procedure, rule 86. Defendants' plea to the jurisdiction is only an exception to the petition, which alleges the parties residences. See: Pinkston v. Farmers State Bank, Tex.Civ.App., 201 S. W.2d 595, at page 602 (syl. 11) citing Uvalde Rock Asphalt Co. v. Asphalt Belt Ry. Co., Tex.Com.App., 262 S.W. 736, 737; McDonald's "Texas Civil Practice", Sec. 4.25, Sec. 4.41. For instance, venue is not lost, according to T.R. 86, unless the party claiming the privilege is not a resident of the county of suit when his plea of privilege is filed, and the exception does not allege this. We see no reason why this judgment should be distinguished from one rendered on the merits of a cause governed by Art. 1995, since the right claimed is only venue, and we hold that the question of venue asserted here was waived because no plea of privilege was filed. The opinion of the Commission of Appeals in Uvalde Rock Asphalt Co. v. Asphalt Belt Ry. Co. at 262 S.W. 736, reversed on other grounds at 267 S.W. 688, is not in point because the injunction was granted in that case on the allegations of the petition, ex parte, and in such a case there is no place for a plea of privilege. This distinction applies to other temporary injunctions cited by the defendants, and to other cases where a plea of privilege cannot or need not be filed in order to raise the question of venue on appeal.

The injunction under review prohibits, in terms, all future picketing of the plaintiff by the defendants; and under Point 2 the defendants assign error to the trial court's refusal to modify this language as the Austin Court of Civil Appeals modified the decree reviewed by them in Texas State Federation of Labor v. Brown & Root, 246 S.W.2d 938. This decision would entitle defendants to the modification requested by them if the prohibition of future picketing be limited to conduct intended to accomplish the purpose prohibited by paragraph 2 of the injunction, namely, to compel plaintiff to make a "closed shop" agreement with defendants. In such a case, the modification requested would certainly do the plaintiff no harm and would clarify the injunction. However, plaintiff does not say that the prohibition of all picketing is only ancillary to the prohibition of efforts to make the plaintiff enter into a "closed shop" contract. Instead, plaintiff argues in support of the prohibition of future picketing, first, that this was right because of violence during the dispute and next, quoting Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, that a permanent injunction will be modified or vacated upon proof that the conditions have changed. Plaintiff then seems to argue, by quotation from North East Texas Motor Lines v. Dickson, 148 Tex. 35, 219 S.W.2d 795, at page 798, 11 A.L.R.2d 1065, that the general language of the injunction should be construed as only a prohibition of picketing which is not an incident of a lawful labor dispute. We will discuss those arguments in the order stated.

It is to be borne in mind, in considering plaintiff's argument, that the pipe line has been built, and of the findings made by the jury, only those to Issues 12 and 13 are material to the question, whether picketing after the pipe line was built should be prohibited because of violence. The finding under Issue 12 is to be read with that under Issue 11 and this being done, we construe the findings under Issues 12 and 13 as meaning only that future picketing would probably be accompanied by physical violence and threats of violence and by acts which may be described by the words coercion and intimidation. That is, these findings mean that future picketing would be accompanied by unlawful conduct, not that future lawful picketing would have a coercive picketing because of what had happened.

Points 7 to 10, inclusive, attack the sufficiency of the evidence to support the findings under Issues 12 and 13, Points 7 and 9 raising the question of law, whether there is any evidence, and Points 8 and 10 invoking our jurisdiction to determine a question of fact.

Assuming, without deciding, that all of the conduct now to be described was rightfully considered in determining whether the injunction should be granted, the findings under Issues 12 and 13 depend for support upon the following evidence, which is, of course, stated wholly from the plaintiff's standpoint, in support of the verdict.

Plaintiff was awarded the contract to build the pipe line in February, as we have stated. On March 9th, and again on March 17th, representatives of some of the defendant unions had the conferences with H. B. Zachry we have mentioned. Three forms of contracts were submitted to Mr. Zachry for consideration but he refused to enter into any agreement with said unions. By March 16th plaintiff was employing workmen for work on the southern end of the pipe line and on March 19th plaintiff began to construct the line at this end, in Jefferson County; and by that time or at least before picketing began, plaintiff had established an office and warehouse at Amelia, in Jefferson County. Picketing of these premises began on March 27th and continued until this office and warehouse were moved to Kountze, in Hardin County. This was done on March 30th. On April 1st picketing began again at the new site of the office and warehouse and continued until Mr. Collier, a representative of the defendant Union 798 was served with the restraining order. This occurred on April 2nd. The picketing then stopped.

There is no evidence of any unlawful conduct toward the plaintiff, connected with the dispute between the parties, before the conference of March 9th occurred. Plaintiff had had some experience of violence in Kentucky but the testimony about that does not connect that with the present dispute. Balch's statement testified to by Zachry was made "several months previously" to the conference of March 9th and evidently referred to the "job in Tennessee for the Texas Eastern Gas Transmission Company" which Zachry said "we were beginning." Mr. Zachry testified to statements at the conference of March 17th, made by Mr. Collier and by Mr. Stewart, who was a representative of the defendant Pipe Line Workers Local Union No. 38, but these statements did not portend any act unlawful in itself, apart from the purpose (disputed by the parties) respecting the nature of the contract wanted. And after these conferences Mr. Zachry had no more communication with any of defendants until his talk with Mr. Collier, Mr. Stewart and Mr. McNeese at the picket line on April 1st. This brings us down to the actual picketing which, as we have stated, began on March 27th, Saturday.

The only picketing proved was done at the sites of plaintiff's office and warehouse at the southern end of the pipe line, first at Amelia and next at Kountze, and the only violence or threats proved was upon or to workmen directed from this office. The plaintiff also started work at the same time on the northern end of this line. Mr. Zachry said: "We started two spreads at one time—one at Corsicana and one at this

end. We hired a substantial number of men on both of them." There is no evidence that the northern group was picketed or interfered with in any way. Plaintiff had an office in San Antonio, and there is no evidence that it or any other office or place of work of the plaintiff, excepting that at the southern end of the pipe line, were picketed.

Only one act of violence was committed by a picket. There is evidence in plaintiff's behalf (defendants' rebuttal need not be stated) that a picket at Amelia tried to stop one of plaintiff's trucks and then tried to hit a person in the truck's cab with his sign but hit the cab.

There is, however, much evidence that, except on the day after plaintiff's office was moved to Kountze, many persons were present from day to day on the road at the picket line, both at Amelia and at Kountze, in groups estimated variously by different witnesses to number from 100 to 200, and that threats of violence, both to plaintiff's employees and to their families and to individual employees of plaintiff, some of whom are mentioned below, were made by people in this group. There is evidence that representatives of some of the defendants were constantly among this group and that persons would come out of this group and carry the picket signs.

Plaintiff used trucks in the construction of the pipe line, and there is evidence that some of plaintiff's workmen assembled at the office and were taken from there to the place of work in a truck driven by Youngblood, and that on April 1st, at Kountze, this truck and others were to leave the plaintiff's premises to start work but persons assembled at the picket line were in the road and about the entrance to plaintiff's premises in large numbers and supervisory employees of the plaintiff, fearing trouble, delayed for about two hours sending out these vehicles, including Youngblood's with workmen in it. They did this after the delay mentioned. Walker preceded Youngblood, driving a truck called a low-boy, and his departure, as was that of Youngblood, was impeded and slowed but was not stopped. Men from the group attending the pickets entered at least one automobile, and this automobile got in front of Walker and tried to stop him but did not. This seems to have been the incident mentioned by Capt. Hamer. According to him, three automobiles followed Youngblood and Walker and he followed these, but the pursuit of plaintiff's vehicles was abandoned.

There is also evidence that the following instances of threats and of violence occurred at places away from the picket line. On one occasion, apparently while the office was still at Amelia, plaintiff's employees at work on the pipe line observed a number of men in automobiles at the place where they would come into the road on leaving their work. This was in the evening. The number of men assembled at this place was not definitely proved but it was large. Williams said: "one evening there was a bunch of cars along the road, about nine, and a bunch of men were standing on the road." And according to Ainsworth, a representative of one of the defendant unions was in this group. There was that in the situation which made plaintiff's employees fear that they would be interfered with when they came into the road and they notified the circumstances to the plaintiff's office, apparently by a radio, (an interesting circumstance), and a special officer came out to them and escorted them back to plaintiff's office.

On Monday night, March 29th, Reed and Folk, welders employed by plaintiff, were chased by four automobiles while they were in an automobile after talking earlier that night with a representative of a defendant union and a number of other persons who were with this man. This representative and others in the group tried to persuade Reed and Folk to quit plaintiff's employ, and insulting remarks were made to Reed and Folk by persons in this group. The people who pursued Reed and Folk tried to stop them and the circumstances imply that their intention was to do violence.

Reed and Folk did leave the plaintiff's employ on the next day, but both later returned to work for the plaintiff. Reed said that he did this after the picketing had been injoined, but Folk did not know whether picketing had ended when he returned to work. Both of these men owned valuable equipment which they used in their work for plaintiff.

On the same night, March 29th, incidents involving two other employees of the plaintiff, Shirey and Smith, occurred at the place of lodging of these men. Threats were made to Shirey by two persons who had left plaintiff's employ when the picketing began and had appeared among the group assembled at the picket line. And on the same evening and at the same place, these same two former employees so conducted themselves toward Smith as to show that they would have attacked Smith if he had not been able to avoid them, and in this he had assistance from the person who managed the place of lodgng. One of the two former employees had threatened Smith on the day before and had pushed him violently.

No other violence or threat of violence during the period when plaintiff was being picketed was proved, and this picketing ended on April 2nd, as we have stated. However, on April 8th, two craters were found in the right of way of the pipe line. These had been made by explosions and one of the explosions had so injured the pipe that a part of it had to be replaced.

Excepting this explosion, no threats or unlawful conduct against plaintiff, its property or employees, was proved after the picketing ended on April 2nd, and when the pickets left so did the people who assembled at the picket line. The restraining order and the temporary injunction were obeyed. It is to be noted that the period for which we have evidence of conduct after picketing ended was nearly a month, beginning on April 2nd and ending with the end of the trial of the cause. This trial began on April 27th and the charge was submitted and the verdict returned on May 1st.

It is of some materiality to inquire whether the plaintiff lost workmen after the picketing began and whether the loss of workmen was caused by the picketing or by the other conduct summarized, but there is little evidence regarding those matters. Shields, who supervised the crew of laborers who cut brush along the right of way ahead of the construction crew, said that out of between 25 and 35 men, some 8 or 10, most of whom were saw operators, quit on the day picketing began or on the day after, but that after about 2 days the usual number were again in employ. Plaintiff had actually hired an additional crew for him after his operations in Jefferson County had been completed and had been extended into adjoining Hardin County, and it is to be noted that this occurred while the picketing was still going on. Plaintiff had not been able to hire this crew in Jefferson County. Youngblood said that the men he carried in his truck "changed some" after the picketing began; and Mr. Zachry said that a substantial number of employees quit after the picketing began, but he did not know how many and he declined to estimate this number. According to his testimony some replacements from other states were hired. Of the fifteen workmen of plaintiff who testified, only Reed and Folk had quit and these two owned and used valuable equipment which was subject to damage. There is evidence from Shirey that the threats made by the group at the picket line were discussed by plaintiff's employees, but the evidence does not show what these people learned of the incidents occurring away from the picket line.

It is to be noted that plaintiff did not move the office into Hardin County because forced to do so. Mr. Zachry said that 10 miles of the pipe line were in Jefferson County and that work in that county had been completed when plaintiff moved into Hardin County.

It is also of some materiality to consider the nature of the plaintiff's business and, in general, where it is performed. As we have stated, plaintiff engages in the con-

struction industry and the plaintiff's places of work are not certain and fixed nor is the amount of work which plaintiff has from time to time, but these matters are uncertain and depend upon contracts which plaintiff is able to get when it happens that construction work is to be done. Mr. Zachry said that most of plaintiff's work was in Texas but that some of it was in other states. Some of plaintiff's work moves from point to point over a considerable distance as did the construction of the pipe line to which we have referred. This line according to Mr. Zachry, was 208 miles long, and we have referred to testimony of his that work on the line was begun at the northern and southern ends simultaneously. We note that plaintiff proved no other construction contract except one which, Mr. Zachry said, plaintiff had in Fort Worth.

The meaning of the findings to Issues 12 and 13 must be borne in mind in determining whether they are supported by the evidence. Stated in the words of the respective Issues, the finding under Issue 12 is that "any future picketing of any character will in reasonable probability result in a continuation of threats, coercion or intimidation", and that under Issue 13 is that "any future picketing of any character will in reasonable probability result in a crystallization of such conduct into actual physical violence." As we have stated, these are not findings that lawful picketing would have a coercive effect but are, instead, findings that picketing would in all probability be accompanied by unlawful conduct. Furthermore, these findings must have referred in part to future operations on the construction of the pipe line, most of which evidently had yet to be built since it was 208 miles long; but the terms of Issues 12 and 13 refer to the future generally and not to the period ending with the completion of the line. We express no opinion as to whether the findings under Issues 12 and 13 are supported as respects the construction of the pipe line; but we do hold that the evidence does not support the findings under Issues 12 and 13

as respects picketing to occur after the pipe line had been built.

This holding is based on the following conclusions from the evidence we have summarized. In the *first place,* as our statement of the evidence shows, the conduct of persons who carried the picket signs was not violent except on one occasion. The unlawful conduct at the picket line was that of the persons assembled there and it consisted almost wholly of threats. Even when, on April 1st, the situation seemed so threatening that workmen were not sent out for almost two hours and when this was finally done the passage of the vehicles was impeded by the numerous persons about the entrance to plaintiff's premises, no violence occurred at the line. The pursuit of Walker's and Youngblood's trucks at this time was an act portending violence, and there was Smith's encounter with Williams at Beaumont, which may have occurred near the picket line, and there was the cutting of Daniel's tires, apparently while his automobile was parked near the warehouse at Amelia; but the other acts or threats of violence proved (those to Reed and Folk, to Shirey and to Smith) and the assembly of men on the road where plaintiff's workmen were to leave their work occurred away from the picket line, and all except the latter occurred at night, two of them at places of lodging, and all seem more to be incidents of the dispute than of the picketing. And this seems true of the assembly of persons at the picket line, at least after the plaintiff's headquarters moved to Kountze, for in the statement of facts there are photographs of the latter place showing that plaintiff's premises were in a wooded and rural area, requiring some effort to reach. In the *second place,* the defendants have shown themselves to be amenable to judicial order. The restraining order of April 1st and the temporary injunction of April 17th forbade unlawful conduct as well as picketing, and those orders have been obeyed. As we have stated, the persons who assembled at the picket line went away when picketing had been stopped by the restrain-

ing order and they did not return, and there are no more complaints of violence or of threats toward plaintiff's employees or property away from the picket line. And when the special officer appeared at the place of work the group of men assembled there, and it was large, did not interfere with him or with plaintiff's employees. Nor, and this is significant, did this group interfere with plaintiff's men while the latter were on the right of way of the pipe line; they remained on the road where they had a right to be. It would seem that people as amenable to control as these circumstances show are not likely to become uncontrollable simply because a picket walks about with a card on a stick. In the *third place,* the nature of plaintiff's business and of the way it functions indicates that picketing and unlawful conduct have no necessary connection. Plaintiff's places of work, just as plaintiff's work itself, seem, in a sense, to be unpredictable. That is, the plaintiff does construction work where it may happen that plaintiff's services are acceptable and needed, and some of this work is done out of Texas. Is it to be assumed that any picketing of the plaintiff anywhere in Texas, or that picketing of plaintiff outside of Texas, by these defendants will probably be accompanied by unlawful conduct? There is no evidence that the public generally or any considerable number of people have taken any interest in or even know about the controversy between plaintiff and defendants; and it does not appear that the construction industry generally or any employer in that industry other than the plaintiff is involved in this controversy. The limited and local nature of the interference with the plaintiff attempted is shown by the failure to picket the northern group of plaintiff's workmen or other places of business of the plaintiff's. Taking all these matters into consideration, it would seem that if some future place of work of the plaintiff's happens to be picketed and this picketing happens to be accompanied by unlawful conduct this would be a result of a plan and a deliberate intent, or of circumstances which have no connection with the dispute as it stands in this record, and the obedience paid the injunctions granted in this cause is cogent evidence that such conduct could be controlled by injunction. In the *fourth place* it may be considered, as a circumstance, whether there is evidence that future picketing would have a coercive effect, since, if it would not, this fact would indicate that picketing would not be accompanied by unlawful conduct. There is no evidence that future lawful picketing would have a coercive effect, and the circumstances show that plaintiff was not seriously interfered with. Thus, plaintiff completed the work in Jefferson County and then moved its office to Kountze while the pickets were up, and in Hardin County, adjoining Jefferson, hired a second crew of men to cut brush, all of this being done while the pickets were up. The number of men in the original brush gang was reduced about one third after the picketing began but after about two days was back at full strength. The circumstances pertaining to the nature of the plaintiff's business and to the local and limited nature of the interference with plaintiff, to all of which we have referred, also has some bearing here. In the *fifth place,* it may be considered, as a circumstance, whether there is any evidence of a plan of and intent by the defendants, or any of them, to engage in unlawful conduct on future lawful picketing. There is none except the statements to Mr. Zachry by Mr. Collier and Mr. Stewart at the conference of March 17th and the events which have happened since, and this evidence seems hardly enough to convict any of the defendants of such a plan.

We therefore sustain Points 7 and 9 to the extent that the findings under Issues 12 and 13 refer to picketing after the construction of the pipe line. The specific holding is one of law, that there is no evidence as regards such future picketing. Points 8 and 10 raise questions of fact and are not decided.

These comments conclude our discussion of plaintiff's argument that the prohibition

of future picketing was justified by violence which had occurred. Next to be considered is plaintiff's argument that the injunction under review is to be construed as was that in North East Texas Motor Lines v. Dixon, 148 Tex. 35, 219 S.W.2d 795, at page 798, 11 A.L.R.2d 1065, namely, as prohibiting only picketing which is not an incident of a lawful labor dispute. In the case cited, picketing had begun before any dispute arose, and that is not the case here. The decision, then, is only suggestive, and whether a limitation should be placed, by construction, on the injunction under review depends on the intent expressed in the judgment, and the terms of this decree are not limited. The record shows that the trial court was requested to limit the restraining order, the temporary injunction and the judgment under review as was done in Texas State Federation of Labor v. Brown & Root, supra, and each time refused to do so. Furthermore, if the findings under Issues 12 and 13 are to be literally construed, the probability of future unlawful conduct as an incident of picketing would be inconsistent with a modification which excepted lawful picketing. Under the circumstances, we think that the trial court meant the prohibition of future picketing to be construed literally, at least so far as regards the construction of the rest of the pipe line; and the language of the decree does not lend itself to an interpretation that the future picketing prohibited was only future picketing along this particular pipe line. We accordingly overrule this argument of plaintiff's.

Point 2 is sustained.

Next to be considered are points affecting the prohibition of a conspiracy to compel plaintiff to hire only union members for workmen. This is paragraph 2 of the injunction and it is based on the jury's answers to Issues 14, 15, 16 and 4 and answers to Issues 1, 2, and 3.

The jury found that one purpose of the picketing "by those defendants who engaged in such picketing" was (Issue 14) to protest Zachry's refusal to agree to contracts submitted to him at the conference of March 9th and (Issue 15)· one purpose was to· compel Zachry to agree to those contracts, that (Issue 16) they had still another purpose, and that (Issue 4) one of the purposes of the picketing was to compel plaintiff to adopt a "closed shop labor policy". The term "closed shop labor policy" was defined, in substance, as being one under which plaintiff would hire only union members. This finding to Issue 4 does not state who it was that had the purpose to make plaintiff adopt a "closed shop" policy, but Issue 16 must refer to these parties and so these are the defendants who engaged in the picketing. The identity of these defendants was sought to be established by Issues 1, 2 and 3.

Issues 14, 15 and 16 and the findings thereto are not attacked. However, Point 21 assigns error to the overruling of an objection to the definition given with Issue 4. This objection was rightly overruled and Point 21 is overruled. Point 22 assigns as error that there is no evidence to support the finding to Issue 4. The question submitted in Issue 4 was one of fact as regards Unions 798, 38, and 450. Defendants' evidence is that such a purpose did not exist, but as regards defendant Unions Nos. 798, 38 and 450, the finding is supported by testimony of Zachry concerning statements made to him at the conference of March 17th by Collier, Stewart and McNeese, representatives of these unions. Picketing began only 10 days later. Point 22 is sustained. Point 23 raises a question of fact about the finding and is not decided.

As we have stated, the identity of the defendants who had in mind the various purposes established by the findings to Issues 14, 15, 16 and 4 was sought to be established by Issues 1, 2 and 3. The jury answered that (Issue 1) the defendant unions Nos. 38, 450, 798 and 195 had "entered into an agreement to picket" the plaintiff, and that (Issue 2) the defendant Trades Council of Beaumont and (Issue 3) the defendant union No. 819 were parties to this agreement. Defendants assign as error that

these findings are not supported by the evidence.

We construe Issues 1, 2 and 3 as referring only to an agreement to do the picketing actually done. There is no evidence of any agreement to picket plaintiff after the pipe line was constructed.

The only agreement to picket plaintiff for which there is affirmative testimony is that testified to by Collier and Stewart. According to them, the pickets' pay was to come in equal parts from their unions and that of McNeese, that is, No. 798, No. 38 and No. 450, and Collier testified in general terms that his union had no agreement with any of the defendants except No. 195 and this was about jurisdiction. This evidence makes the agreement to do picketing actually done one between these three unions only, and there is no affirmative testimony that any other defendant union was or became a party to this agreement, either originally or by ratification or by authority delegated to any of these three.

An agreement to picket made by the three unions mentioned is what one would expect from evidence in behalf of plaintiff about the conferences of March 9th and 17th. Collier, Stewart and McNeese attended both and Pierce, another representative of McNeese's Union 450, attended the first; and Collier, Stewart and McNeese each submitted a form of contract and nobody else did, and each of these three, according to Zachry, wanted a closed shop from the plaintiff while nobody else asked for one. Zachry said that during the conference of March 17th, Collier threatened to picket the pipe line and Stewart said that a major fight against plaintiff was beginning. As regards defendant Union 195, referred to in Issue 1, its representative Morrison attended the conference of March 9th but not that of the 17th, and he submitted no contract, and Zachry testified to no statement by him. As regards defendant Union 819, referred to in Issue 1, its representative Crunk did not attend the conference of March 9th but did attend that of March 17th, and submitted no contract and had little to say. Zach-

ry did not testify to what Crunk said and only guessed at Crunk's motive in attending the conference ("We had a job in Fort Worth which I figure he was trying to organize."). Furthermore, an agreement by only the unions of Collier, Stewart and McNeese is in accord with evidence about the picketing done. Thus, neither Morrison nor Crunk participated in the picketing and Morrison's office was in Beaumont, near Amelia. Collier's testimony that Morrison's union had ceded jurisdiction to Collier's union over pipelining work explains why Morrison would not participate in the picketing. Crunk's office was in Fort Worth and there is no evidence that he was in the area during the picketing. The testimony which plaintiff cites as showing the contrary is hearsay and incompetent. On the other hand, Collier, Stewart and McNeese all participated in the picketing as did Wintrode, another representative of Collier's union, and Long, another representative of Stewart's union. The only other union official who took part in the picketing was Flowers, a representative of the defendant Trades Council.

■ Point 15 assigns as error that there is no evidence to support the finding to Issue 1 as regards defendant Union 195. To repeat, this finding, in the language of Issue 1, is that "on or before March 27 defendants Pipe Line Workers Local Union No. 38, Pipe Line Local Union No. 450, Pipe Liners Local No. 798 and Pipe Fitters Local No. 195 entered into an agreement to picket the H. B. Zachry Company." To determine the question made by Point 15, we must first ascertain the meaning of this finding. We construe this, as we have stated, as referring to an agreement to do the picketing done, not to do picketing after the pipe line was built. Further, to say that Union 195 has "entered into an agreement' is like saying that it "entered into a con tract", and if we give such words their ordinary meaning it would be implied that Union 195 had acted as a party, that is, directly or through an agent, as an individual does in making a contract. So, turning now to the matter of evidence, is there evi-

dence that Union 195, acting directly or through the agency of another, entered into the agreement to picket? There is none and the affirmative testimony is to the contrary. As support for the finding plaintiff says that Union 195 would have had the benefit of the contract submitted to plaintiff by Collier. However, this contract, which is defendants' exhibit 3, would have run between the plaintiff and the "United Association of Journeymen and Apprentices," etc. The nature of the Association and its relation to defendant Unions 798 and 195 is not shown. The contract would only have affected Union 195, if at all, through paragraph C of Art. III, reading as follows: "Union (that is, the association) agrees to send a copy of this agreement to each of its *local unions having pipe line jurisdiction* and agrees that the terms of this agreement shall be recognized by each local. The enforcement of this agreement by Union is vested in such local unions as may be designated by Union to handle work covered under this agreement." This provision alone, that is, without other evidence, does not make the Association an agent of the local unions; and it does make the contract operate only in behalf of "local unions having pipe line jurisdiction". Well, Collier testified that the agreement between Union 798 and Union 195 was that "pipe lining work" comes under the jurisdiction of No. 798 and further, that Union 798 had jurisdiction over pipe lines only. Presumably, then, Union 195 had jurisdiction over other kinds of pipe work and had no immediate or direct interest in a contract with plaintiff for the construction of the pipe line. It is at least not apparent how the contract would have operated in behalf of Union 195, and the lack of information about the nature of the Association and its relation to Unions 798 and 195 emphasize this fact. The attendance of Union 195's representative Morrison at the conference of March 9th indicates that he did have some interest in the contract asked for by Collier, but this is only a circumstance, and we hold that the evidence does not show that Morrison's union "entered into the agreement" to do the picketing which was

done. Point 15 is sustained. Point 16 raises a question of fact concerning the finding to Issue 1 and is not decided.

Point 13 assigns as error that there is no evidence to support the finding to Issue 2, that the defendant Trades Council was "a party to such agreement," meaning the agreement to picket plaintiff which was found under Issue 1. This finding depends on evidence that Mr. Flowers, whom Mr. Collier called the "business agent" of the defendant Trades Council, participated in the picketing at Amelia. The conversation testified to by Reed would be no more than a circumstance strengthening inferences from this evidence. Did this conduct make the Trades Council a party to the agreement? Not unless the "business agent" had authority to do that, and there is nothing in the circumstances which takes the matter out of the operation of the rule that declarations and acts of the alleged agent outside of court ordinarily prove neither agency nor authority. Then was the conduct of the "business agent" enough circumstantial evidence to make a question of fact, whether the Trades Council had, in some way not proved, entered into the agreement before the "business agent" began to act? If it was, acts of an agent would generally prove a contract binding a principal and would simply abrogate the rule about an alleged agent's declarations and acts just mentioned. It is not our intention to state a rule applicable to every case, but on the circumstances before us we sustain Point 13. Point 14 raises a question of fact concerning the finding to Issue 2 and is not decided. We are cognizant of the rule that a union can sometimes be restrained from acting although the evidence does not show that the acts provoking the injunction were authorized by the union. See: Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, at page 842 (syl. 6). But this rule is not applicable.

Point 11 assigns as error that there is no evidence that defendant Union 819 was "a party to such agreement", meaning the

agreement to picket plaintiff found under Issue 1. The petition names this union the Engineers Local Union No. 819 of the International Union of Operating Engineers, and Zachry under cross examination by defendants' counsel recalled that Crunk identified his union (at the March 17th conference) as Engineers Local 819. However, the evidence does not show what the relation was, if any there was, between. Union 819 and the International Union of Operating Engineers. The only agent or representative of Union 819 who is shown to have had any connection with the negotiations for contracts with the plaintiff is Crunk and the only thing he is shown to have done was his participation in the conference of March 17th. To repeat, he submitted no contract at this meeting, he took little part in the discussion, no threat or prediction is traced to him, and nobody ever did testify to what Crunk said. He is not shown to have had any connection with the picketing, and Collier testified in general terms that his union, No. 798, had no agreement with defendant except Union 195. Further, Cole, a member of Union 819, who had been at work for plaintiff on the pipe line since this work began, said that as far as he knew his local had had nothing to do with this picketing. Plaintiff argues that the contract form submitted by McNeese, a representative of Union 450, would have been for the benefit of Crunk's Union, No. 819, and that Union 819 was a party to the agreement because of McNeese's actions. A similar argument was made in support of the finding to Issue 1 and some of our comments there apply here. Thus the contract form submitted by McNeese would have run between plaintiff and the "International Union of Operating Engineers for the United States of America and Canada", and there is no evidence connecting either McNeese's Union 450 or Crunk's Union 819 with this International Union. The petition alleges that McNeese's Union 450 belongs to another International Union altogether; the name alleged is "Pipe Line Local Union No. 450 of the International Union of Hoisting and Portable Engineers". Furthermore, the contract form submitted

by McNeese would only have operated upon another union by virtue of Article X reading as follows: "The Union agrees to send a copy of this contract to each and every one of its Locals having jurisdiction over any area in which Employer becomes obligated to construct a pipe line, and agrees that the terms of this contract shall be recognized by such Local, so that industrial peace will not be disturbed and so that the Employer may prosecute Employer's work efficiently and continuously." This provision alone, without other evidence, would not be enough to make the International Union an agent for Crunk's Union 819, and we hold here as we did concerning Issue 1, that whether Crunk's union became a party to the agreement to picket plaintiff depended on evidence that it acted directly or through an agent. Point 11 is sustained. Point 12 raises a question of fact concerning the finding to Issue 3 and is not decided.

Points 3, 4, 5 and 6 attack the sufficiency of the evidence to sustain the findings under Issues 5 and 11. Point 26 assigns error to the overruling of objections to Issue 11. These findings refer to conduct while plaintiff's premises were being picketed and so all of these points are moot.

Points 17 and 18 assign error to the admission of evidence about the craters on the right of way of the pipe line, and Points 19 and 20 assign error to the admission of evidence about the incident involving Shirey. The evidence objected to has been stated. If there is error here we think it presents no ground for reversal with respect to issues not now moot.

Point 24 assigns error to the refusal to submit defendant's requested Issue 9. This issue was rightly refused and Point 24 is overruled.

■ Point 25 assigns error to the refusal to submit defendant's requested Issue 11. The subject matter of this Issue is adequately covered by other issues submitted. Point 25 is overruled.

■ Point 27 assigns as error that the National Labor Relations Board had ex-

clusive jurisdiction of this controversy. This Point is overruled.

These comments adjudicate all Points of Error.

The appeal stands now as follows: Issues affecting only the pipe line are moot. The prohibition of picketing after the construction of the pipe line is not justified by anything except the conspiracy and the defendants have a right to picket lawfully, for lawful purposes, which ought to be provided for. The findings that defendant Unions 195 and 819 and that the defendant Trades Council were parties to the agreement to picket the plaintiff were not supported by evidence, but the relationship of the unions and of the Council to the controversy has not been fully developed and this is material because of the plaintiff's allegations of conspiracy. On the other hand, assignments attacking the findings on which depend the prohibition of conspiracy by defendant Unions 798, 38 and 450 have been overruled. Judgment, therefore, is rendered as follows: The prohibition of picketing in paragraph 1 of the injunction is set aside. As regards Unions 195 and 819 and the Trades Council the judgment of the trial court is reversed and the cause is remanded as to the issues pertaining to conspiracy, which are the only issues involving these defendants not now moot. As regards Unions 798, 38 and 450, the prohibitions in paragraph 2 of the injunction are affirmed. The prohibitions against unlawful conduct made in paragraph 3 of the injunction are governed by the conclusions which determined our judgment respecting picketing and it, too, is set aside. This leaves in force paragraph 2 of the injunction as regards Unions 798, 38 and 450.

A copy of the permanent injunction referred to in the opinion is attached.

It is hereby ordered, adjudged and decreed by the court that the defendants herein, and each of them, their officers, agents, servants, and employees be, and they are hereby, permanently enjoined and restrained, and commanded to cease and desist, from:

1. Continuing, establishing, calling, participating in, aiding and abetting, maintaining or causing to be established or maintained, or from threatening to establish or maintain, any manner of picket or pickets at, near or in the immediate vicinity of the offices, places of business or job sites of plaintiff.

2. Entering into, continuing or engaging in a conspiracy or combination of capital, skill and acts between or among them, or between any one or more of them and any other person, firm, corporation or association of persons to accomplish any one or more of the following objectives:

(a) To force plaintiff to agree to deny, and to deny, employment to persons on account of non-membership in a labor union.

(b) To create or tend to create or carry out restrictions in trade or commerce or aids to commerce or transportation, or to create or carry out restrictions in the free pursuit of the business of plaintiff.

(c) To monoplize the erection, construction, and repair of all buildings, structures, excavations, installations and improvements, public and private, so that all such erections, constructions, excavations or repairs shall be done only by those persons, firms, corporations and associations that deny employment to all persons who are not members in good standing of a labor union approved by defendants.

(d) To damage or destroy or attempt to damage or destroy the business of plaintiff by use of any of the means enumerated in (a) through (c) unless plaintiff agrees to and does employ in its business undertakings only members of labor unions, and unless it agrees to and does deny employment to all others.

3. From committing any act of violence, assault, assault and battery, attack or abuse of the person or any one of the plaintiff's employees, or of the plaintiff, its officers, agents, servants or employees; and from

threatening, intimidating or coercing, cursing, abusing or following the plaintiff, its officers, agents, servants or employees; and from damaging, injuring, or destroying or threatening to damage, injure or destroy the plaintiff's machines, equipment, work or construction; and from performing or threatening to perform by threats, intimidation, persuasive coercion, or in any other manner, any act in furtherance of the conspiracy or combination referred to in paragraph 2 hereof.